**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| HUMAN POWER OF N COMPANY,<br><br>                              Plaintiff,<br><br>    v.<br><br>NATHAN BRYAN, PNEUMA NITRIC OXIDE, LLC, NITRIC OXIDE INNOVATIONS, LLC and BRYAN NITRICEUTICALS, LLC,<br><br>                              Defendants. | Civ. A. No.: 1:21-cv-00811 |

## PLAINTIFF'S ORIGINAL VERIFIED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Plaintiff, Human Power of N Company ("HumanN" or the "Company"), by and through its undersigned attorneys, and files this Original Verified Complaint against Nathan Bryan ("Bryan"), Pneuma Nitric Oxide, LLC ("PNO"), Nitric Oxide Innovations, LLC ("NOI") and Bryan Nitriceuticals, LLC ("BN") (collectively, "Defendants") and in support thereof, alleges as follows:

### NATURE OF THE ACTION

1.      Plaintiff HumanN brings this complaint against its former Chief Science Officer Nathan Bryan and the companies he founded for, among other things, theft of trade secrets, breach of fiduciary duty, breach of contract, false advertising, unfair competition, and civil conspiracy, all arising out of Bryan's unlawful and intentionally destructive conduct spanning several years and continuing to this day.

2.      HumanN is an industry leader in functional foods and nutritional supplements for whole body health. Founded in 2009 by Joel Kocher ("Kocher"), the #2 executive at Dell Computer during its meteoric rise, HumanN developed a portfolio of nutrition-based products, including the best-selling Neo40® lozenges and SuperBeets® powder, the latter the first product within the SuperBeets® brand. These particular products featured a patented nitric oxide technology that HumanN licensed from the University of Texas Health Science Center ("UTHSC"). Defendant Bryan, while an assistant professor at UTHSC, worked on and patented those nitric oxide methods and compositions. When Kocher and his fellow co-founders, AnnMarie Kocher and Janet Zand, decided to launch HumanN, they invited Bryan to become its Chief Science Officer ("CSO") as well as the proverbial face of the Company. Kocher named Bryan an additional co-founder of the Company, granted him shares of the Company's common stock, and provided him monthly fees. Due to his affiliation with UTHSC, Bryan also receives a percentage of all royalty fees that HumanN pays to UTHSC. Based in large part on the nearly $100 million that HumanN has spent advertising its products, Bryan has risen from relative obscurity to achieve national prominence as a co-founder of HumanN and an expert in nitric oxide ("N-O") technology. Based in part on the royalty payments he receives, Bryan has, in his own words, profited well beyond his wildest dreams.

3.      Due to the blockbuster success of Neo40® and SuperBeets®, and the reputation for quality that HumanN garnered as a brand, HumanN expanded its offerings beyond its original products into brand line extensions, such as Supergrapes®, which do not utilize UTHSC's licensed N-O technology. As a result of HumanN's brand expansion, Bryan no longer receives royalty payments on every product that HumanN sells – something Bryan found intolerable. Illogical as it may seem, Bryan did not want the Company to grow through the sale of new

products if that growth made the Company less dependent on his patented technology. The proverbial one-trick pony, Bryan did not want the Company to outgrow him, notwithstanding the fact that as a shareholder he stood to benefit financially, and to a greater degree at that, from a more diversified HumanN.

4.      Afraid that he was becoming increasing less valuable to the Company and guided by hubris as opposed to common business sense, Bryan embarked upon a plan to wrest control of HumanN from Kocher to derail its expansion plans. To do so, Bryan repeatedly disparaged both HumanN management and its product strategy to its shareholders, falsely claiming, among other things, that HumanN was straying from its core scientific foundation, intentionally misleading its customers, and launching brand extensions for the sole purpose of avoiding royalty payments to Bryan. These allegations were false – a conclusion that is inescapable as quarter after quarter HumanN has experienced record growth and along with it, Bryan's royalties have only risen. HumanN's shareholders, looking at the bottom line, pleased with the growing fortunes of the Company and unconcerned with Bryan's waning influence, supported management and refused Bryan's call for upheaval.

5.      After Bryan's initial "strategy" fell flat, he embarked upon a plan to hijack HumanN's credibility, technology, brand, and success for his own commercial benefit to the exclusion of HumanN and his fellow shareholders. First, he continued to disparage HumanN to its suppliers, competitors, and customers, criticizing the Company's new products and falsely claiming that HumanN "abandoned the medical channel." Bryan's actions emboldened a competitor to intensify its efforts in the medical segment, causing great damage to HumanN. Next, Bryan used HumanN's confidential information and trade secrets to assist a competing company in its launch of N-O products, a violation of both his restrictive covenant with HumanN

and his fiduciary duty to the Company, yet again causing damage to HumanN. Next, seeking to
further capitalize on the damage he caused to HumanN's reputation in the medical channel, he
launched three competing companies – co-defendants PNO, NOI, and BN – for the express
purpose of commercializing N-O products which directly compete with HumanN. Each does so
wrongfully utilizing and exploiting HumanN's proprietary information and trade secrets.

6.      To promote PNO. NOI, and BN and market his allegedly "new" N-O products to
HumanN's own customers, Bryan inflates his own credentials, claiming to be a professor at
UTHSC even though he has not been affiliated with it since 2014, and claiming to be a professor
at Baylor College of Medicine even though he only serves as a voluntary adjunct assistant
professor, typically an unpaid position. Bryan also unfairly trades on HumanN's reputation,
intentionally causing confusion in the marketplace, misleading consumers into believing that
HumanN, PNO, NOI and BN are somehow affiliated by misrepresenting his current affiliation
with HumanN, and falsely claiming HumanN's sales, clinical research, and technology as his
own – even though HumanN, not Bryan, is the licensee of the UTHSC technology. Bryan also
makes both false and reckless claims about his "new" products, claiming that they are superior to
HumanN's own products and making numerous, unfounded claims concerning his supplements'
purported ability to treat COVID-19.

7.      By publishing false and misleading commercial speech concerning their own and
HumanN's commercial activities and products, Bryan, NOI, PNO and BN engaged in false
advertising and violated Section 43(a) of the Lanham Act. By their actions, Bryan, PNO, NOI
and BN are causing confusion in the marketplace and irreparable harm to HumanN's reputation
and goodwill. By wrongfully misappropriating HumanN's confidential information and trade

secrets, Defendants violated both Texas law and the Federal Defend Secrets Act, both to HumanN's injury.

8.      Although HumanN sent six cease-and-desist letters attempting to avoid litigation against Bryan, his most recent actions now leave the Company with no choice. As such, HumanN brings this action against Bryan, PNO, NOI,  and BN to, *inter alia*: a) enjoin Defendants from continuing to make false and misleading statements unlawfully trading on HumanN's reputation and goodwill; b) enjoin Defendants from continuing to confuse consumers into thinking that PNO's and NOI's products are sponsored and/or affiliated with HumanN and that BN's products are superior to HumanN's; c) enjoin Defendants' further unlawful misappropriation of HumanN's confidential information and trade secrets d) enjoin Bryan's continued disparagement of HumanN; and e) for other common law and statutory violations.

9.      HumanN also seeks injunctive relief and damages, including treble damages and liquidated damages for Bryan's repeated willful violations of the non-disparagement provisions in his consulting agreement with HumanN.[1]

## THE PARTIES

10.      Human Power of N Company, formerly Neogenis Laboratories, Inc., is a Texas corporation with its principal place of business located in Austin, Travis County, Texas.

11.      Upon information and belief, Nathan Bryan is an individual residing in Milam County, Texas, and may be served with process at his home address of 9625 FM 908 S, Rockdale, Texas 76567-3529 or wherever he may be found.

---

[1] HumanN commenced a separate action against Bryan in Texas state court in Travis County on May 21, 2020, seeking a declaratory judgment that Bryan is prohibited from exercising certain stock options granted by HumanN based upon the Company's determination that he engaged in activity that is materially detrimental to the best interests of the Company and its shareholders. That action is pending.

12.     Upon information and belief, Pneuma Nitric Oxide, LLC is a limited liability company organized and existing under the laws of the State of Texas. PNO may be served with process by serving its registered agent, Nathan Bryan, 9625 FM 908 S, Rockdale, Texas 76567-3529.

13.     Upon information and belief, Nitric Oxide Innovations, LLC is a limited liability company organized and existing under the laws of the State of Texas. NOI may be served with process by serving its registered agent, Nathan Bryan, 9625 FM 908 S, Rockdale, Texas 76567-3529.

14.     Upon information and belief, Bryan Nitriceuticals, LLC is a limited liability company organized and existing under the laws of the State of Texas. BN may be served with process by serving its registered agent Nathan Bryan, 9625 S FM 908, Rockdale, Texas 76567-3529.

<u>JURISDICTION AND VENUE</u>

15.     This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff's claims arise under the Lanham Act, 15 U.S.C. § 1125(a) and the Defend Trade Secrets Act of 2016, Public Law 114-153 (May 11, 2016). This Court has jurisdiction over HumanN's state law claims pursuant to 28 U.S.C. § 1367 and the doctrine of supplemental jurisdiction.

16.     Bryan, PNO, NOI and BN are each citizens of Texas and are subject to this Court's personal jurisdiction.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claim occurred in this district.

## BACKGROUND FACTS

18.     HumanN is an innovative and successful supplement and functional foods company founded in 2009 by Joel Kocher, along with AnnMarie Kocher, Dr. Janet Zand and defendant Bryan. HumanN aspires to be the best company in the Nutrition Health industry and to change the lives of its customers through the proliferation of products using the highest quality and efficiently bioavailable ingredients, sponsoring or having clinical support for its efficacy claims, and in some lines, featuring its patented nitric oxide technology.

19.     Nitric oxide, or "N-O," is an essential cardiovascular signaling molecule. N-O signals human blood vessels to relax, helping to dilate arteries and thereby increase circulation and enhance oxygenation.

20.     A rich source of dietary nitrates is found in green, leafy vegetables and beets, although many people do not consume enough high nitrate vegetables and thereby become N-O deficient. The same is true of grape seed extract (GSE), an ingredient in many of HumanN's products both in - and separate from - the SuperBeets brand franchise. Here, the polyphenols, another source of N-O functionality, tends to be under-consumed in the normal human diet. Functional foods and dietary supplements may help increase N-O levels. HumanN is committed to bringing the best N-O functional foods and supplements to consumers.

### HumanN's Products & Commercial Success

21.     HumanN creates and markets nutritional supplements aimed at the benefits of good heart and circulatory health, including Neo40®, and functional foods, including BeetElite® and SuperBeets®, relying, in part, on patented N-O technology licensed from UTHSC.

22.     HumanN pays royalties to UTHSC for the exclusive right to use its patents. In turn, UTHSC pays a percentage of its royalties to defendant Bryan, one of the inventors on the UTHSC patents.

23.     The first product created by HumanN (then was named Neogenis) was Neo40. HumanN spent countless hours developing a potent supplement that would deliver N-O effectively and efficiently. After months of searching, Kocher and Bryan found a manufacturer with the capabilities and know-how to produce the specialized lozenge that Neo40 required. Neo40 was brought to market in 2010.

24.     Certain aspects of the Neo40 product design and manufacturing incorporate specific trade secrets and know-how that were discovered over time and at great expense during product development. These trade secrets include identification and testing of specific botanical ingredient sources that yield better generation of N-O in the formula, as well as certain ingredient sources that yield better structural integrity in the lozenge due to parameters such as particle size and compressibility.

25.     The next products HumanN developed were SuperBeets Original and Black Cherry, a beet powder that harnesses N-O technology to support healthy circulation, blood pressure and energy levels, and BeetElite, another beet powder product that improved endurance. Both products were brought to market in 2013.

26.     By virtue of its enormous success, SuperBeets achieved "brand" status, causing HumanN to bring several product-line extensions to the marketplace, including SuperBeets Energy (launched in 2017), SuperBeets Immune (launched in 2018) and SuperBeets Collagen (launched in 2018).

27.     SuperBeets Collagen mixes the Company's beets and GSE with collagen peptides to help support healthy skin. The other line extensions work in a similar manner, i.e., they combine ingredients that support oxygenation as well as support for other bodily functions and organic systems.

28.     HumanN has spent a significant amount of money and hours on clinical trials to ensure the efficacy of its products.

29.     HumanN also maintains a seven-member Scientific Advisory Board, which includes scientists who are experts in the areas of nutrition, functional foods, supplements, kinesiology and N-O research.

30.     In 2017, HumanN was awarded Nutrition Business Journal's Science Award.

31.     HumanN has invested millions of dollars in quality assurance, quality control, and scientific advancement and validation in connection with its products.

32.     HumanN has spent nearly $100 million in promoting, marketing and advertising its brands, so that HumanN's brands are seen by the market as signifying quality and excellence.

33.     Because of its enormous investments of time and money, HumanN and its Neo40, SuperBeets, and BeetElite brands have built up tremendous consumer recognition, trust and goodwill.

34.     HumanN is one of the top superfood companies in the nutrition market and has been named to the prestigious INC Magazine's Fastest Growth Companies in America for the past seven consecutive years.

35.     To date, HumanN has sold over 5 million canisters of SuperBeets branded products and over 50 million Neo40 tablets.

36.     HumanN's beet products have been used by over 120 professional and Division I collegiate sports teams.

### HumanN Explores Alternative Products and Protects its Proprietary Information

37.     While HumanN's current product line focuses on functional foods and supplements, it also invests significant resources exploring alternative innovative nitric oxide technologies and product solutions.

38.     In or around 2012, HumanN and Bryan began exploring and working on development of a N-O activating topical crème and a dual chamber dispensing system.

39.     Bryan's work for HumanN continued into 2015, as HumanN continued to explore new product concepts including N-O based cosmetics that would utilize N-O to reduce fine lines and facial wrinkles and a dual chamber topical vaginal rejuvenation crème. This anti-aging wrinkle cream utilized a unique "dual chamber pump" delivery system.

40.     Bryan's and HumanN's research and development into topical N-O applications was extensive, with the Company creating topical formulations, a prototype of a dual chamber pump delivery system, product packaging, and even engaging in focus groups.

41.     The market for HumanN's products is competitive. HumanN competes on the basis of, *inter alia*, the unique formulations and capabilities of its innovative products, and the precise care the Company takes in the manufacture, quality assurance, quality control and scientific backing and validation of its products.

42.     HumanN's success is and has been dependent on its ability to protect its confidential information and trade secrets, including, for example, its product design, formulations, manufacturing processes, product performance information, business strategies, and new product pipeline.

43.     HumanN has a proprietary interest in its confidential information and trade secrets.

44.     HumanN takes extensive precautions to protect its confidential information and trade secrets, including requiring employees, consultants, and potential partners to execute non-disclosure agreements, not divulging manufacturer names or the specific formulations, processes or measurements involved in manufacturing certain products, and password protecting access to key information and databases.

**The History Behind HumanN's Formation and Bryan's Appointed Role and Compensation**

45.     Kocher was the guiding force behind HumanN's formation. An internationally recognized business leader, his multiple successes include guiding Dell Computer to national prominence as the #2 executive behind Michael Dell. He was profiled by Business Week in a 1997 article written after he left Dell and joined Power Computing, titled "Power Computing's Power Duo," accessible online at web.archive.org.

46.     Knowing how to build a company from the ground level and sufficiently motivate and empower employees, Kocher made Bryan a co-founder of HumanN to ensure his long-term support for research and development efforts. Bryan had virtually zero business experience or acumen at the time and added no value in terms of running a P&L, marketing, managing a team, or doing the many other tasks necessary to build a profitable business. Nor was Bryan financially able to contribute the necessary funds to launch and grow a company. To the contrary, Bryan was broke and had a history of not paying his debts to a variety of creditors, having filed for bankruptcy in 2000 in Louisiana even though the majority of his creditors (landlords, car leases, credit card issuers) were in Texas (In Re Nathan S. Bryan, Index # 00-12255, United States Bankruptcy Court, Western District of Louisiana). He could not even afford to make the

mortgage payments on his ranch and asked other co-founders to lend him money, which they did. Notwithstanding Bryan's lack of business experience or financial prowess – two traits one generally looks for in a founder of a company – Kocher nevertheless deemed Bryan valuable and made him a co-founder of the Company, a position Bryan gladly accepted.

47.     In addition to making Bryan a co-founder of HumanN, Kocher also allocated him founders stock – making him the third largest shareholder – and appointed him as the Company's CSO shortly after HumanN was founded. So happy was Bryan with the opportunity that Kocher presented him, taking Bryan from the verge of financial ruin and the obscurity of a science lab to the forefront and face of a soon-to-be burgeoning business enterprise, that Bryan frequently and publicly praised Kocher.

48.     In his role as the Company's CSO, Bryan was involved in product development, including development of Neo40. He engaged in research and competitive product analysis, assisted HumanN with clinical trials, interacted with customers, authored publications on behalf of HumanN, and represented HumanN at numerous medical and industry conferences (always at HumanN's expense).

49.     Kocher also made Bryan the proverbial face of HumanN, featuring him prominently in its advertising and building his reputation through association with the success of HumanN and its brands.

50.     Even though Bryan was an employee of UTHSC at the time HumanN's licensed technology was patented and received a salary from the UTHSC until 2014 when his contract terminated, Bryan nonetheless receives a percentage of the royalties UTHSC receives from HumanN due to UTHSC policy.

51.     Notwithstanding his share of the hundreds of thousands of dollars of annual royalties he anticipated receiving from UTHSC, which was in addition to his university salary, Bryan complained that he needed money and also wanted to get paid by HumanN, even before it generated any sales or had any revenue.

52.     As a result of Bryan's complaints, and to pacify him, Kocher and his wife AnnMarie and Janet Zand, the other co-founders of HumanN, agreed to contribute money from their own pockets in order to be able to pay Bryan. Accordingly, even prior to the Company's launch of its first product, the Kochers and Zand started to pay Bryan $5,000 per month.

53.     Notwithstanding the receipt of guaranteed monthly payments despite the absence of any revenue, Bryan also demanded that he be reimbursed for all his expenses, which HumanN also agreed to do, notwithstanding the fact that neither the Kochers nor Zand were reimbursed for their out-of-pocket travel expenses.

### Bryan's Obligations Under His Initial Contract with HumanN

54.     On or about February 12, 2010, HumanN and Bryan entered into a three-year Consulting Agreement ("2010 Consulting Agreement").

55.     The 2010 Consulting Agreement defined Confidential Information to be "any information that relates to the actual or anticipated business or research and development of the Company, technical data, trade secrets or know-how, including, but not limited to, research, product plans or other information regarding Company's products or services and markets therefor, customer lists and customers [ ], software, developments, inventions, processes, formulas, technology, designs, drawing, engineering, hardware configuration information, marketing, finances or other business information."

56.    Pursuant to the 2010 Consulting Agreement, Bryan agreed not to use any HumanN Confidential Information for any purpose whatsoever other than the performance of Services (defined therein) on behalf of HumanN, and not to disclose HumanN Confidential Information to any third party.

57.    Pursuant to the 2010 Consulting Agreement, Bryan also agreed that all copyrightable formulas, packaging, deliverables, material, notes, records, inventions, improvements, developments, discoveries and trade secrets he conceived, discovered, developed solely or in collaboration with others, during the term of the agreement that related in any manner to the business of the Company that he was directed to undertake, investigate or experiment with or that he became associated with in work, investigation or experimentation in the Company's line of business in performing Services under the agreement (collectively, "Inventions") would be sole property of the Company, and he assigned fully to the Company all Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating to all Inventions.

58.    Although the 2010 Consulting Agreement lapsed pursuant to its express terms on or about February 12, 2013, Bryan and HumanN continued to perform under the contract's terms as if it remained in full effect, with Bryan continuing to serve as the Company's CSO and continuing to perform Services for the Company.

**HumanN Allows Bryan and SHS to
Private Label Neo40 on Extremely Favorable Terms**

59.    In or about December of 2015, Bryan and Maria Watson, another of HumanN's shareholders, approached HumanN and requested that Watson's company, SHS, be granted the opportunity to resell Neo40 on a private label basis, as N-O Pro, and market it to medical professionals to build a brand.

60.     Watson represented that given her and Bryan's contacts with medical professionals, the two could grow HumanN business in this segment.

61.     HumanN agreed to allow SHS the opportunity to resell Neo40 subject to two conditions. First, SHS would focus only on new business opportunities and not sell to existing HumanN medical channel accounts or prospects, and second, SHS agreed not be associated in any fashion with the CBD oil or extract business.

62.     HumanN was adamant that SHS not be associated in any way with CBD products, as the Company had spent several years and millions of dollars building the science credibility and reputation of N-O products and made a conscious decision not to be in any way involved in any products incorporating CBD. This was due both to the controversial nature of such products and the FDA's scrutiny of products from any company involved in this segment.

63.     HumanN further requested that SHS agree that HumanN's long-time Director of Medical Sales and Development, Susan Shaffer, not be involved, because it did not want customers to be confused as to HumanN's involvement with SHS.

64.     SHS agreed to HumanN's conditions, and SHS and HumanN entered into an agreement to resell Neo40 as N-O Pro. Because Watson and Bryan were shareholders and trusted allies of HumanN, HumanN provided SHS with Neo40 at extremely discounted rates.

65.     Consistent with Watson and SHS's stated intention to grow the N-O Pro brand, the parties agreed that SHS would promote N-O Pro at industry events and conferences targeted to the medical community.

66.     Despite an affirmation otherwise, after entering into the agreement with SHS, HumanN discovered that SHS also intended to employ Shaffer who, along with Bryan, was the other face of HumanN's medical channel efforts.

**HumanN Discovers Bryan is Surreptitiously Touting Products for a Competitor**

67.     In January 2017, a physician asked AnnMarie Kocher whether HumanN had entered the cannabinoid oil business, because he had seen Bryan promoting CBD oil products on behalf of a company named PrimeMyBody ("PMB"), a multi-level-marketing company that sold hemp and CBD oil products.

68.     HumanN was extremely dismayed to learn that Bryan was recklessly promoting PMB's hemp oil products, as Bryan knew of HumanN's reasoned decision to steer away from CBD, yet he elected to promote CBD while at the same time holding himself out as the CSO and "Founder" of HumanN (which, as explained above, was false, since he was merely one of several co-founders).

69.     After investigating the matter, HumanN discovered several podcasts done by Bryan promoting PMB's CBD oil products, and Bryan's bio and photo on PMB's website and Facebook pages (which, adding insult to injury, was the same photo that HumanN paid for and posted on its website to promote Bryan).

70.     After confronting Bryan with its discovery, Bryan lied to HumanN, claiming that PMB utilized his bio and photo and placed both upon their website and social media pages without his knowledge or permission. He also claimed and that he had "no contract or relationship with PMB and that he simply agreed to provide an education from a scientist on hemp oil to their reps and nothing else as a favor to a high school friend." Bryan's denials were false because he had been doing calls on behalf of and receiving payments from PMB since September 2016. Moreover, he had been negotiating a formal contract with PMB since at least November of 2016.

71.     Unbeknownst to HumanN, that same day Bryan surreptitiously emailed PMB's CEO using an alternate email address (so that it would not appear on the HumanN email system) and requested that PMB send a letter to him on PMB letterhead, claiming that PMB had no contract with Bryan nor permission to use his name and/or educational material he voluntarily provided.

72.     Unaware at the time of Bryan's lies and the true extent of his involvement with PMB, but nevertheless fearing damage to HumanN's reputation from the affiliation of Bryan with a CBD oil company and based on the confusion that had already occurred, on or about January 21, 2017, HumanN concluded that it had no choice but to remove Bryan from his position as the Company's CSO. HumanN did not come to its decision lightly as the Company had invested millions in building the scientific credibility around Bryan as the face of HumanN.

73.     On or about February 10, 2017, HumanN sent Bryan a letter memorializing its decision that Bryan could no longer serve as HumanN's CSO and its intention to remove any reference to him as CSO from HumanN's marketing materials and its website to further protect HumanN from any damage caused by Bryan's affiliation with a CBD oil company. HumanN further informed Bryan that he was no longer allowed to conduct any media engagements on behalf of HumanN.

74.     Realizing for the first time that HumanN and Bryan's 2010 Consulting Agreement had lapsed but still unaware of the true extent of the ties between Bryan and PMB, HumanN nevertheless noted its willingness "in the spirit of trying to move forward" to discuss a paid consulting agreement, "targeted at a specific set of activities, which would be done at the sole request of HumanN."

**HumanN and Bryan Enter into the 2017 Consulting Agreement**

75.    On or about April 21, 2017, Bryan and HumanN entered into a second written consulting agreement (the "2017 Consulting Agreement").

76.    Pursuant to the 2017 Consulting Agreement, HumanN once again agreed to pay Bryan $5,000 per month and to reimburse him for all reasonable business expenses, in exchange for Services Bryan provided to HumanN.

77.    Pursuant to the 2017 Consulting Agreement, Bryan agreed that any and all Work Product (which the agreement defined as, "any and ideas, concepts, processes, discoveries, developments, formulae, information, materials, improvements, designs, artwork, content, software programs, other copyrightable works, and any other work product created, conceived or developed by Bryan (whether alone or jointly with others) for the Company during the term of the Agreement in the performance of the services hereinunder, including all copyrights, patents, trademarks, trade secrets, and other intellectual property rights therein) shall be the sole and exclusive property of the Company."

78.    Bryan also agreed that he would not use or disclose any HumanN Confidential Information (which the 2017 Consulting Agreement defined to include "any technical and nontechnical information related to the Company's products and services" furnished by the Company to Bryan, including without limitation, "information concerning research, development, design details and specifications") except for the performance of Services or as expressly permitted in the agreement. Bryan further agreed that all HumanN Confidential Information was the property of the Company.

79.    Bryan further agreed that during the term of the 2017 Consulting Agreement and for a period of one year thereafter, he would not provide services to any third party competitor of

the Company relating to the development, manufacturing or sale of formulations comprising nitrates or nitrites, including, without limitation, formulations that are: (a) over the counter dietary supplements for humans and veterinary applications; (b) over the counter exercise formulas for humans and veterinary applications; or (c) incorporate in any significant way nitric oxide.

80.     Bryan further agreed not to make any written or verbal statements, or encourage others to make any such statements, that defame, disparage or criticize the personal or business reputation, practices or conduct of HumanN or its officers and not to take any actions that cause or will cause any disruption of HumanN's business or interfere with or otherwise impede the activities of any employee of HumanN.

### Bryan Breaches His Agreement by Interfering in HumanN's Business and Misrepresenting His Role and Relationship with HumanN

81.     Although now bound by a second written consulting agreement with HumanN, Bryan simply would not honor his agreements.

82.     Although Bryan was no longer HumanN's CSO, he continued to falsely represent himself as such. Bryan also continued to falsely represent himself as the "Founder" of HumanN and the sole inventor of HumanN's Neo40 and N-O Pro products, when in fact he was merely one of three inventors. He also falsely claimed that the technology HumanN licensed from UTHSC was "his," when in fact it is owned by UTHSC. Despite Bryan's best, albeit unscrupulous, efforts to convince HumanN's customers, competitors, suppliers, contractors and the medical industry at large that he alone is the Founder of HumanN and owner and sole inventor of its technology, none of his claims were or are true.

83.     In June 2017, HumanN learned that Bryan wrongfully misrepresented himself as the "Founder" of HumanN and entered into a March 2016 contract committing HumanN to pay

more than $84,000 for a clinical study without authorization. As a result of Bryan's actions, HumanN was forced to incur outstanding amounts due for the study in excess of $44,000.

84.    Around this time, Bryan and HumanN management also began to repeatedly clash concerning HumanN's marketing strategy, its strategic plan, and its decision to launch brand extensions that did not utilize royalty-bearing technology. While Bryan had virtually zero marketing or business savvy, was not qualified for a position in HumanN senior management and was merely an assistant professor at UTHSC before HumanN brought him on board, he continually tried to inject himself into business, marketing, and branding decisions, about which he was ill-equipped to offer any insight.

85.    While he claimed that by launching brand extensions HumanN was straying from its scientific foundation and misleading consumers, in reality Bryan's complaints had nothing to do with science and were simply the result of his own personal greed, because as HumanN expanded its product offerings to include supplements not reliant on royalty-bearing technology, that in turn would deprive Bryan of his share of the royalties.

86.    When HumanN management and shareholders refused to change course upon his demand, in early 2018 Bryan went as far as to threaten to make it his "personal mission" to get all the members of the Company's Science Advisory Board to resign.

87.     Bryan's wrongdoing did not end there. He sought reimbursement for expenses that HumanN had neither pre-approved nor authorized, and he refused to return to HumanN two pieces of equipment (N-O analyzers) that it paid for based on Bryan's representation that if HumanN funded a particular research project, HumanN would own them.

88.    Continuing his pattern of disregarding his obligations, in May of 2018, against the explicit instructions from HumanN, Bryan interfered with HumanN's attempt to settle litigation

threatened against it by a company named Thermolife, a highly litigious patent troll. Bryan's conduct and disclosures to Thermolife representatives were materially detrimental to HumanN, and ultimately Thermolife sued HumanN.

89.     Shortly thereafter, HumanN management learned that Bryan had been contacting HumanN stockholders and making disparaging statements concerning HumanN leadership, claiming that AnnMarie Kocher and Joel Kocher were trying to "mislead the stockholders" and spreading false rumors that HumanN was "for sale." HumanN shareholders include not only employees who are negatively influenced by adversity within the ranks, but also include suppliers and outside capital sources.

90.     On or about July 20, 2018, HumanN sent Bryan a cease-and-desist letter putting him on notice that his actions breached his 2017 Consulting Agreement, informing him that effective immediately he was removed as a member of the Company's Science Advisory Board, and demanding that he return the N-O Analyzers or pay their replacement value.

**HumanN Agrees to Amend the 2017 Consulting Agreement at Bryan's Request**

91.     In late 2018, HumanN's legal counsel in the Thermolife litigation, Bob Rouder ("Rouder") of Norton Rose Fulbright at the time, requested a meeting with Bryan to discuss the complaint Thermolife had filed against HumanN. Rouder believed that Bryan might be well-suited to provide scientific information that could illuminate and bring insight into the claims that ThermoLife was making.

92.     Although the purpose of the meeting was to discuss the Thermolife complaint, Bryan quickly changed the subject and told Rouder that he wanted HumanN to agree to amend the 2017 Consulting Agreement so he could work on an FDA-approved medical device using N-O technology to treat wounds. He told Rouder that if HumanN agreed to the modification, he

would "stop bad mouthing" HumanN (thereby admitting that he had been disparaging the Company) and agitating against it.

93.     Despite being repeatedly advised by Rouder that he shouldn't disclose anything to him that he did not want HumanN to know because Rouder represented HumanN and not Bryan, Bryan pulled out a loose-leaf binder and showed Rouder a business plan for a company he had formed to market a topical formulation designed to produce N-O gas to treat wounds, some of which necessitated treatment in a healthcare or wound care facility. The plan called for the delivery of the topical to be achieved by means of a dual chamber pump that Bryan had designed and sent to a third-party Chicagoland company to develop a prototype and ostensibly manufacture post-approval. To gain that approval, Bryan further advised Rouder that he had already contracted with a former Pfizer regulatory employee to assist him in getting the product approved by the FDA.

94.     Subsequent to Bryan's meeting with Rouder, as an accommodation to Bryan and unaware of the true extent of Bryan's intended competition with HumanN, HumanN began working with Bryan to negotiate a modification to the 2017 Consulting Agreement consistent with his request.

95.     Notably, even while HumanN agreed to negotiate a modification to the 2017 Consulting Agreement, Bryan continued to publicly disparage HumanN. On or about December 12, 2018, Bryan posted on Facebook: "I've been getting dozens of emails and phone calls about new Superbeet products from HumanN. The Superbeet Energy, Superbeet Immune and Superbeet Collagen do not contain my patented nitric oxide technology (emphasis added). Therefore, these products do not deliver any nitric oxide activity as Superbeets original and BeetElite and Neo40."

**HumanN Agrees to Amend the 2017 Consulting Agreement**

96.     During negotiations concerning the amendment to the Consulting Agreement, Bryan requested that the definition of Work Product be changed and that the change be applied retroactively. In 20-20 hindsight, it is now clear that Bryan was seeking a retroactive amendment because he was already in violation of the agreement.

97.      Although HumanN refused to retroactively change the definition of Work Product, it did agree to limit the post-amendment definition of Work Product and to modify the terms of the non-competition clause set forth in the 2017 Consulting Agreement in exchange for Bryan's re-affirmation of his nondisparagement obligations and his agreement to pay liquidated damages in the event he continued to disparage HumanN.

98.     Consistent therewith, on or about January 26, 2019, HumanN and Bryan entered into an amendment to the 2017 Consulting Agreement (the "Amendment"; the Amendment and the 2017 Consulting Agreement are collectively referred to hereinafter as the "Amended Agreement").

99.     The Amended Agreement further defined and limited Work Product created after execution of the Amendment as Work Product "related to any nitric oxide-based product intended for use as a dietary supplement or nutritional product to be taken orally" ("Post-Amendment Work Product").

100.     Pursuant to the Amended Agreement, HumanN and Bryan agreed that Post-Amendment Work Product shall be for the sole and exclusive use of HumanN. They also agreed that any Post Amendment Work Product which was not related to any N-O based product intended for use as a dietary supplement or nutritional product to be taken orally would be the sole and exclusive property of Bryan.

101.    The Amendment also modified the non-competition clause set forth in the 2017 Consulting Agreement. Pursuant to the Amendment, Bryan agreed that he would not, for a period of two years following execution of the Amendment, provide services to a Competitor, defined as "any company, partnership, business or other enterprise that develops, manufactures or sells over-the-counter dietary supplement, functional foods, ingredients or ingestible supplements for humans and/or animals that utilize nitric oxide formulations in the aforementioned product."

102.    As a condition of the Amendment, Bryan reaffirmed his obligations not to disparage the Company, its leadership, officers, stockholders and other employees, and agreed "not to make any written or verbal statements, or encourage others to make any such statements, that defame, disparage or criticize the personal or business reputation, practices of conduct of the Company, its officers, leadership, stockholders, employees, or any of the Company's products."

103.    Finally, pursuant to the Amendment Bryan agreed that in the event he violated the non-disparagement provision, HumanN would be entitled to liquidated damages in an amount of no less than $25,000 for each such violation, in addition to all other remedies it has in law or equity.

### Bryan Continues Disparaging HumanN and Engaging in Harmful Conduct

104.    Despite HumanN agreeing to amend the 2017 Consulting Agreement and despite the threat of liquidated damages, Bryan continued to disparage the Company and harm its reputation and competitive position in the marketplace.

105.    Indeed, within days of signing the Amendment, HumanN received calls from customers concerned because Bryan and SHS were claiming that HumanN was "no longer servicing the medical channel."

106.    When confronted with the allegations, Bryan in one email both disclaimed ever saying that "HumanN is no longer servicing the medical channel" and then noted SHS's objective to provide NO product technology to the medical channel "(that HumanN abandoned)," a claim that was utterly false since HumanN continues to sell to the medical community.

107.    After HumanN pulled SHS's authorization to resell N-O Pro (based on the sale of the company to a third party known for a presence in the CBD market), Bryan sent additional disparaging emails again falsely claiming that "HumanN abandoned the medical channel" and that "certain Company decisions are reflections of poor decisions by so called 'seasoned executives'" and personally attacking Kocher.

108.    Subsequent to terminating the SHS resale agreement, HumanN learned that Bryan also had falsely told certain customers, "I decide who gets 'my technology' and SHS has it now, since the [HumanN] abandoned the medical channel," and that SHS and Bryan had falsely represented that "SHS was the exclusive distributor of Neo40 technology," that "SHS ha[d] sold millions of Neo40 tablets," and had completed multiple clinical trials of Neo40."

109.    On or about June 26, 2019, and then again on July 1, 2019, HumanN sent Bryan cease-and-desist letters providing him formal notice of his breach of the non-disparagement provision of the Amended Agreement and demanding that he pay the contractually agreed upon liquidated damages amount of $25,000 for each disparaging remark. Bryan failed to do so.

110.    Despite HumanN's repeated demands that Bryan stop disparaging the Company, its officers and products, Bryan's disparagement continued and continues to this day. For example, on or about September 22, 2019, after being admonished by HumanN for making unauthorized comments and reviews about competitive products on social media and causing a

HumanN competitor to make negative and product-challenging claims concerning HumanN products, Bryan sent a disparaging email to the shareholders of HumanN, again claiming wrongly that "HumanN abandoned the medical channel."

111.    Bryan's false and misleading statements caused significant damage to HumanN's medical channel sales, emboldening a chief competitor of HumanN to shift its strategy and focus almost exclusively on the medical channel. His false statements also set the stage for Bryan to unlawfully compete against HumanN with his own three renegade companies, PNO, NOI, and BN.

**Bryan Misappropriates HumanN's Proprietary Information for his Own Personal Gain, Launching PNO, NOI and BN and Assisting PMB in Launching N-O CBD Products**

112.    Less than one month after executing the Amendment – which he claimed he wanted so he could develop an FDA approved medical device to deliver N-O topically to treat wounds – Bryan began misappropriating Human's Confidential Information and trade secrets to unfairly compete against it.

113.    On or about February 19, 2019, Bryan launched Pneuma Nitric Oxide, LLC (the co-defendant previously defined as "PNO") to market and sell a "new" nitric oxide-based crème and an allegedly unique dispensing system for use in skin care and cosmetics.

114.    PNO sells $N^1O^1$, a "Nitric Oxide Activating Serum with a dual chamber delivery system."

115.    Upon information and belief, the topical and dual dispensing system marketed and sold by PNO is the same product Bryan worked on extensively while serving as HumanN's CSO.

116.    Less than four months after executing the Amendment, Bryan launched PNO's flagship topical at A4M, an industry conference that HumanN previously paid for him to attend on behalf of HumanN and attended by numerous HumanN customers. Bryan markets PNO's

topical to the very same doctors and customers he previously interacted with at the expense of and on behalf of HumanN.

117.    During a presentation Bryan gave at A4M, Bryan touted himself as "Founder and Shareholder" at HumanN, as well as Founder and CEO at both NOI and PNO, to intentionally mislead consumers into believing HumanN, NOI and PNO are somehow affiliated and thereby causing confusion in the marketplace.

118.    In addition, in August 2021 PNO began selling a supplement which it refers to as "N1O1 Nitric Oxide" and describes as a "dietary supplement for daily health and circulation" that relies upon an "innovative formula" which uses an "advanced delivery system that provides an exogenous source of nitric oxide."  (The N1O1 supplement is hereinafter referred to as the "N1O1 Tablet".)

119.    PNO's website claims that its N1O1 Tablet is "backed by 20+ years of research and technology" and that as a "result of [Bryan's] research [the N101 Tablet] is the most powerful Nitric Oxide enhancer on the market!"

120.    Upon information and belief, the N1O1 Tablet's "innovative formula," "advanced delivery system," and the "technology" it utilizes was developed by Bryan by improperly utilizing HumanN's work product, know-how, and confidential and trade secret information, including specific botanical ingredient sources that yield better generation of N-O in the formula and certain ingredient sources that yield better structural integrity in the lozenge.

121.    PNO directly competes with HumanN.

122.    In addition, upon information and belief, less than two months after executing the Amendment, Bryan contacted PMB to explore its continued interest in developing a line of N-O CBD products, thereby violating the amended noncompete he had just negotiated with HumanN.

123.    After PMB expressed interest in developing a line of N-O products, Bryan emailed HumanN to personally introduce PMB's CEO, Paul Rogers ("Rogers").

124.    In phone calls with HumanN personnel, Rogers admitted that PMB was about to launch its own N-O ingestible product and that Bryan was working on a N-O-producing topical crème for PMB.

125.    On or about June 26, 2019, HumanN sent Bryan another cease-and-desist letter, noting that any work Bryan did for PMB was a violation of the Amendment.

126.    After Rogers replied by denying that Bryan had anything to do with the launch of PMB's N-O ingestible and HumanN discovered Bryan's launch of PNO, HumanN sent Bryan yet another cease-and-desist letter (the fifth one it had to send to one of its own co-founders) reminding him that pursuant to the terms of his noncompete with HumanN he could not work for any competing company, even if his services were not tied to the production, design, creation or sale of a NO-ingestible. The cease-and-desist letter made clear that any N-O-producing crème or lotion or other product Bryan worked on for PMB, as well as the PNO's Nitric Oxide-Activating Skin Serum and its dual chamber technology, were both HumanN's property.

127.    Upon information and belief, despite HumanN's demand that Bryan cease and desist working with PMB to launch N-O CBD products, Bryan failed to do so. Rather, upon information and belief, with Bryan's assistance, PMB launched a nitric oxide boosting supplement.

128.    PMB's nitric oxide boosting supplement directly competes with HumanN's N-O line of products.

129.    In addition, according to PMB's website, it will soon introduce: "Full Spectrum Hemp NOX, a Nitric Oxide + Hemp Infused Skin Rejuvenation System, [which will] breathe[ ]

life into your skin – flushing impurities and delivering antioxidant rich CBD and Vitamin C & E directly into the dermis."

130.    Upon information and belief, PMB developed Full Spectrum Hemp NOX using Bryan's assistance and HumanN's confidential information, work product and trade secrets.

131.    In addition to violating his contractual obligations under the Amendment by founding PNO and working with PMB, on or about June 25, 2018, while still bound by the terms of the 2017 Consulting Agreement and prior to modification of the definition of the term "Competitor" and the terms of his noncompete, Bryan incorporated NOI.

132.    According to Bryan's LinkedIn page, he is currently affiliated with NOI, PNO and HumanN, where he misleadingly lists himself as "Founder and Inventor" of HumanN from "November 2009 – Present," even though he was merely one of several co-founders and was repeatedly instructed to stop misrepresenting himself as the Founder, and even though he no longer works for or is a consultant to HumanN.

133.    According to NOI's website, NOI was established "to commercialize clinically and scientifically proven Nitric Oxide (NOi) based technologies for a wide range of human disease and conditions" and it has developed an orally disintegrating N-O generating lozenge, an N-O generating topical for wound care, an N-O generating topical for dermatology, and an N-O generating topical for hands and feet to improve blood flow.

134.    Upon information and belief, the N-O generating topical for dermatology referenced on NOI's website is the same topical sold by PNO, which was developed by Bryan utilizing HumanN's work product, confidential, and trade secret information.

135.    Upon information and belief, NOI's lozenge is NOviricid, which Bryan's company touts as the "first oral Nitric Oxide (NO) generating drug to be clinically tested to treat African Americans and Hispanics diagnosed with COVID 19."

136.    In addition, while still bound by the noncompete contained in the Amended Agreement, Bryan founded co-defendant Bryan Nitriceuticals, LLC.

137.    According to press releases, BN is a "nitric oxide focused nutrition and dietary supplement company that provides safe and effective nitric oxide functional food products and dietary supplements."

138.    Through its website located at www.no2U.com, BN markets and sells $NO_2U$, a nitric oxide generating supplement which it describes as a "dietary supplement for daily health and circulation" that relies upon an "innovative formula" which uses an "advanced delivery system that provides an exogenous source of nitric oxide."

139.    BN's website also claims that $NO_2U$ is "backed by 20+ years of research and technology" and that as a "result of [Bryan's] research [$NO_2U$] is the most powerful Nitric Oxide enhancer on the market!"

140.    On its website, BN falsely and without any substantiation claims that $NO_2U$ is the "most powerful Nitric Oxide enhancer on the market" and is "currently the most powerful Nitric Oxide supplement on the market."

141.    Upon information and belief, $NO_2U$'s "innovative formula," "advanced delivery system," and the "technology" it utilizes was developed by Bryan in violation of the noncompete contained in the Amended Agreement and improperly utilizes HumanN's work product, know-how, and confidential and trade secret information, including specific botanical ingredient

sources that yield better generation of N-O in the formula and certain ingredient sources that yield better structural integrity in the lozenge.

142.    BN directly competes with HumanN.

### Bryan Unfairly Trades on HumanN's Reputation and Intentionally Causes Confusion in the Marketplace to Market and Sell His "New" Products

143.    On or about June 15, 2021, a press release issued on behalf of Bryan and NOI touting NOviricid falsely claimed that "Over 100 million doses of our OTC nitric oxide product has been sold in the U.S. without a single adverse event reported" (emphasis added).

144.    Upon information and belief, NOI has not sold even one dose of an OTC nitric oxide product. Rather, the 100 million doses of OTC nitric oxide product referenced in the NOI press release falsely and misleadingly refers to, and attempts to capitalize on, HumanN's sales of Nitric Oxide products, of which over 100 million servings have in fact been sold.

145.    The day after the NOI press release was issued, Bryan gave a YouTube interview where he continually and purposefully blurred the line between HumanN, NOI and PNO, using the pronoun "we" to refer interchangeably to actions and products created by all three companies as if they are somehow connected and/or affiliated.

146.    For example, in the beginning of the interview, Bryan refers to HumanN, stating: "when we launched the nitric oxide product [ ] we brought to market over years ago." A few minutes later in the interview he uses the same "we" to refer to NOI and PNO, stating: "we're developing topical drugs for non-healing ulcers;" "we do have a topical nitric oxide that we positioned as a cosmetic;" and "we have a product called n101." Later, Bryan pivots back using the pronoun "we" again to refer to HumanN, stating "we published on this in 2015 just specifically to answer that question because we wanted to know-how much broccoli or celery or spinach or kale would you need to eat to get enough nitric oxide to normalize your

blood pressure and so we went to five cities across the us went to New York, Chicago, Raleigh, Dallas and Los Angeles and we pulled these same vegetables off the shelf and whole foods brought it to the lab and we quantified their nitrate nitrite. . . ." Still referring to HumanN, he then states: "what we've done is a little bit different. We've actually optimized that process and done a pre-conversion of the beets to where beets that I've created had on the market for the past 10 years, we pre-converted to where we're not relying on the bacteria because most people don't have the right bacteria so when you take our beet product [referring to HumanN's Superbeets] or the lozenges [referring to HumanN's Neo40 product] we've done the hard work for you so when you take our products you get nitric oxide produced every single time in every single patient."

147.    Two months later, in August 2021, Bryan traveled to Nepal, where, upon information and belief, along with a purported Texas philanthropist, BN donated $790,000 worth of Nitric Oxide products to Nepal for the COVID-19 crisis.

148.    During a press conference touting the donation, Bryan continued to blur the lines between HumanN and his renegade companies – this time BN – with Bryan falsely claiming that the nitric oxide dietary supplement being donated to Nepal is a widely used and recommended product among COVID-19 patients in the U.S. and that "using the supplement twice on a daily basis shall improve the saturated oxygen level in the body and reduce the rate of hospitalization." Bryan was joined at the press conference with a HumanN Neo40 customer, who said that the "supplement has proven to be very effective for him personally."

149.    Upon information and belief, as of the date Bryan travelled to Nepal, neither BN nor any of Bryan's other companies had sold even one dose of an OTC nitric oxide product.

Rather the "widely used" nitric oxide dietary supplement referenced by Bryan falsely and misleadingly referred to HumanN's Neo40.

150.    Upon his return from Nepal, Bryan continued to purposefully blur the lines between HumanN, NOI and BN, again using the pronoun "we" to refer interchangeably to actions and products created by all three companies as if they are somehow affiliated and engaging in false advertising.

151.    For example, on or about August 25, 2021, Bryan appeared on the Trent Loos show, Loos Tales, which airs on over 100 stations nationwide and boasts 3 million listeners on-air and online. HumanN previously marketed its SuperBeets and Neo40 brands on Loos Tales.

152.    During Bryan's appearance of Loos Tales, Bryan continued to promote his trip to Nepal and BN's donation of nitric oxide products to Nepal. At the beginning of the interview, after discussing his trip to Nepal, referring to NOI, Bryan stated "we have a drug in clinical trials in the U.S.," and "we have a nitric oxide drug." Later in the interview, Bryan pivots and uses the same "we" to refer to HumanN and takes credit for HumanN's sales and extensive validation process. For example, after being asked how people can get nitric oxide as a supplementation, Bryan ticks off a list of lifestyle changes people can make and then adds, referring to HumanN, "if that's not enough than yeah you can take some nitric oxide supplements or a lozenge that 'we' developed over 10 years ago and sold probably 80-100 million of them." Still referring to HumanN he states, "all beets aren't created equal. [ ] 'we' used a lot of these commercial beet powders as our placebo in a clinical trial" and "'we' did a nationwide study from New York to Raleigh to LA and Chicago and Dallas and went and took vegetables off of the shelf and measured the nitrate content because 'we' wanted to see how much broccoli or celery would you need to eat to get enough nitrate to normalize your blood pressure." Ending the interview, Bryan

pivots back to NOI and BN and his trip to Nepal, stating that he sent the doctors he met in Nepal "what 'we' [referring to NOI] submitted to the FDA," and that "'we' [referring to BN] did a press conference." Bryan ends the interview, claiming that "'we' know that COVID is a disease of nitric oxide deficiency; now "we" [referring to BN and NOI] have technology to replete it and make people better from COVID or prevent them from getting disease.

153.    Most recently, Bryan took to Instagram, this time using HumanN product and promotional photos without permission and using the pronoun "we" to claim credit for Superbeets and to continue to mislead consumers into believing he continues to be affiliated with HumanN even though he is currently not employed by the Company, does not serve it an any advisory capacity, and has been instructed multiple times that he is not authorized to promote HumanN and/or its products due to the marketplace confusion he causes.



154.    Through his LinkedIn Page, NOI's press release, his social media interviews, and his Instagram post, Bryan, NOI, PNO and BN intentionally and successfully cause marketplace confusion, creating a misleading impression of affiliation and endorsement of NOI, PNO, and BN by HumanN.

155.    The statements contained in Bryan's LinkedIn page, NOI's press release, his Instagram post and throughout his social media interviews deceived or have the capacity to deceive a substantial segment of potential customers and influence their purchasing decisions.

156.    Bryan's shameless effort to criticize HumanN when it suits him but attempt to cloak himself in the success and legitimacy of HumanN when he wants to misappropriate its goodwill, knows no bounds, as evidenced by two recent social media posts: a May 5, 2021 Instagram post where he reposted a picture of himself during the filming of HumanN's first SuperBeets commercial years ago and then disparaged HumanN, warning customers to "Look for patents on Superbeet products to ensure they deliver nitric oxide" and not to "be fooled by creative marketing," and this July 27, 2021 post to his 50,000 followers, where he "coincidentally" wears a HumanN promotional t-shirt.



157.    Happy to cloak himself in HumanN's success when it suits him, he continues to disparage the Company when it does not, telling one of HumanN's medical distributors in August 2021 that he is no longer affiliated with HumanN because he does not like the way it

manufactures Neo40, and that the Neo40 technology is "his." This is of course false, because HumanN is the sole and exclusive license holder for the N-O patented technology in Neo40.

158.    HumanN brings this action to prevent Bryan from continuing to lie and disparage HumanN, to prevent Bryan, PNO, NOI and BN from continuing to engage in false advertising, continuing to utilize and profit from Bryan's theft of HumanN's trade secrets, know-how, confidential information, and Work Product, and from continuing to intentionally and unlawfully hijack HumanN's reputation and goodwill, all to the material detriment of HumanN.

## FIRST CAUSE OF ACTION
### *Breach of Contract Against Bryan*

159.    HumanN incorporates the facts and allegations contained in paragraphs 1 through 158 of this Complaint as if fully set forth herein.

160.    Bryan and HumanN are parties to a valid, binding and enforceable contract in the form of the Amended Agreement.

161.    Bryan breached the Amended Agreement by, *inter alia,* forming and providing services to NOI and BN; by providing services to PMB; by making written and verbal statements that disparaged and criticized the business reputation, practices and conduct of HumanN and its officers; and disparaging HumanN's products.

162.    HumanN has fully performed all the obligations required of it under the Amended Agreement.

163.    As a natural and probable consequence of Bryan's material breaches of the Amended Agreement, HumanN has been and continues to be damaged in an amount to be developed during discovery and determined at trial and is and was irreparably harmed.

164.    Pursuant to the Amended Agreement, HumanN is also entitled to liquidated damages in an amount of no less than $25,000 for each violation by Bryan of the non-disparagement provision of the Amended Agreement, as well as recovery of its reasonable attorney's fees, costs and expenses and any other applicable relief incurred in connection with its enforcement of the Amended Agreement.

## SECOND CAUSE OF ACTION

### *Breach of Implied-in-Fact Contract Against Bryan*

165.    HumanN incorporates the facts and allegations contained in paragraphs 1 through 164 of this Complaint as if fully set forth herein.

166.    After the expiration of the 2010 Consulting Agreement, Bryan and HumanN continued to perform under the terms of the 2010 Consulting Agreement until at least January 2017.

167.    As such, Bryan and HumanN implicitly agreed that their rights and obligations should continue to be measured as provided for in the 2010 Consulting Agreement.

168.    As such, Bryan and HumanN were parties to a new implied-in-fact contract that incorporated the terms of the expired 2010 Consulting Agreement.

169.    The new implied-in-fact contract was a valid, binding and enforceable agreement.

170.    Bryan breached the implied-in-fact contract by using HumanN Confidential Information for his own personal benefit and disclosing HumanN Confidential Information to PMB, PNO, NOI and BN.

171.    HumanN has fully performed all the obligations required of it under the implied-in-fact contract that arose between it and Bryan.

-37-

172.    As a natural and probable consequence of Bryan's material breach of the implied-in-fact contract that arose between himself and HumanN, HumanN has been and continued to be damaged in an amount to be determined at trial and was irreparably harmed.

## THIRD CAUSE OF ACTION

### *Breach of Fiduciary Duty Against Bryan*

173.    HumanN incorporates the facts and allegations contained in paragraphs 1 through 172 of this Complaint as if fully set forth herein.

174.    As Chief Science Officer of HumanN, Bryan occupied a position of trust and confidence within HumanN and owed a fiduciary duty to HumanN.

175.    Bryan breached his fiduciary duty to HumanN by disclosing HumanN Confidential Information, trade secrets and know-how to PMB, PNO, NOI and BN.

176.    As a natural and probable consequence of Bryan's breach of his fiduciary duty to HumanN, HumanN has been and continues to be damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### *Aiding and Abetting Breach of Fiduciary Duty Against PNO, NOI and BN*

177.    HumanN incorporates the facts and allegations contained in paragraphs 1 through 176 of this Complaint as if fully set forth herein.

178.    Defendants PNO, NOI and BN are aware of Bryan's fiduciary duty, as well as his contractual obligations to HumanN.

179.    PNO, NOI and BN substantially assisted in Bryan's breach of his fiduciary duty when they directed, encouraged, facilitated and/or permitted Bryan, as PNO's, NOI's and/or BN's agent to use HumanN confidential information, trade secrets and know-how for the benefit of PNO, NOI and BN in breach of his fiduciary duty to HumanN.

180.    As a result of the aforementioned wrongful and intentional actions of defendants PNO, NOI and BN, HumanN has been and will continue to be injured, for which it is entitled to the issuance of an injunction to prevent HumanN from suffering irreparable harm, and to recover compensatory damages and interest in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

*Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act*
*Against all Defendants*

181.    HumanN incorporates the facts and allegations contained in paragraphs 1 through 180 of this Complaint as if fully set forth herein.

182.    HumanN possessed valuable trade secrets in the new product for anti-aging wrinkle cream that utilized a dual chamber pump delivery system to deliver measured doses of vitamin C with $NO_2$, and in the confidential processes, technology and know-how it developed to produce and manufacture the specialized lozenge that Neo40 required.

183.    While an officer and/or consultant for HumanN, Bryan obtained access to HumanN trade secrets, technology and know-how, including its trade secret for an N-O producing topical that would be delivered using a dual chamber pump delivery system to deliver N-O topically in combination with Vitamin C, and its trade secrets, technology and know-how for producing the specialized lozenge that Neo40 required.

184.    HumanN's trade secrets known by Bryan are related to HumanN's products that are used in, or intended for use in, interstate commerce.

185.    HumanN took reasonable precautions to maintain the secrecy of this information.

186.    HumanN's trade secrets derive independent economic value, actual or potential, from not being generally known by or readily ascertainable through proper means by the public.

187.    Defendants misappropriated HumanN's trade secrets.

188.    Defendants have used and are continuing to use HumanN's trade secrets in interstate commerce.

189.    As a result of Defendants' misappropriation and use of HumanN's trade secret information, Defendants each have violated the Defend Trade Secrets Act.

190.    Defendants' misappropriation of HumanN's trade secrets have caused and will continue to cause HumanN irreparable harm and monetary damages if they are not enjoined.

191.    Defendants willfully and maliciously misappropriated HumanN's trade secrets, thus entitling HumanN to an award of exemplary damages under the Defend Trade Secrets Act.

192.    HumanN has no adequate remedy at law.

### SIXTH CAUSE OF ACTION

*Misappropriation of Trade Secrets in Violation of the Texas Uniform Trade Secrets Act Against all Defendants*

193.    HumanN incorporates the facts and allegations contained in paragraphs 1 through 192 of this Complaint as if fully set forth herein.

194.    HumanN possessed valuable trade secrets in the new product concept for anti-aging wrinkle cream that utilized a dual chamber pump delivery system to deliver vitamin C with N-O$_2$ and in the confidential technology, processes and know-how it developed to produce and manufacture the specialized lozenge that Neo40 required.

195.    While an officer and/or consultant for HumanN, Bryan obtained access to HumanN trade secrets, including its trade secrets for an N-O producing topical that would be delivered using a dual chamber pump delivery system to deliver N-O topically in combination with Vitamin C, and for producing the specialized lozenge that Neo40 required.

196.    HumanN's trade secrets known by Bryan are related to HumanN's products that are used in, or intended for use in, interstate commerce.

197.    HumanN took reasonable precautions to maintain the secrecy of this information.

198.    HumanN's trade secrets derive independent economic value, actual or potential, from not being generally known by or readily ascertainable through proper means by the public.

199.    Defendants misappropriated HumanN's trade secrets.

200.    Defendants have used and are continuing to use HumanN's trade secrets in interstate commerce.

201.    As a result of Defendants' misappropriation and use of HumanN's trade secret information, Defendants each have violated the Texas Uniform Trade Secrets Act.

202.    Defendants' misappropriation of HumanN's trade secrets have caused and will continue to cause HumanN irreparable harm and monetary damages if they are not enjoined.

203.    Defendants willfully and maliciously misappropriated HumanN's trade secrets, thus entitling HumanN to an award of exemplary damages and attorneys' fees under the Defend Trade Secrets Act.

204.    HumanN has no adequate remedy at law.

## SEVENTH CAUSE OF ACTION

*False Advertising and False Designation of Origin*
*in Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)*
*Against All Defendants*

205.    HumanN incorporates the facts and allegations contained in paragraphs 1 through 204 of this Complaint as if fully set forth herein.

206.    Bryan's, NOI's, PNO's, and BN's actions as alleged herein constitute false advertising in violation of the Lanham Act, which provides a right to a civil action against:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion … as to the origin … of his or her goods, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or other person's goods, services, or commercial activities,

and provides that such person "shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act."

207.    In commercial speech published to a national audience, Bryan, NOI, PNO and BN made false and misleading statements misrepresenting the nature, characteristics, and qualities of NOI, PNO, BN and HumanN's goods and commercial activities, including but not limited to statements made in NOI's press release, BN's press conference, Bryan's Instagram post, in the social media interviews identified above and the statements contained on BN's website identified above.

208.    Bryan's, NOI's, PNO's and BN's commercial speech constitutes "advertising." Bryan's, NOI's, PNO's and BN's misleading statements were made for the purpose of influencing their own customers and potential customers into purchasing products from PNO, NOI and BN by deceiving them into believing that NOI and PNO are affiliated with, connected with or associated with HumanN, or that NOI's and PNO's products originate from, are sponsored by, or approved by HumanN and that BN's product is more powerful than the N-O products available from HumanN and that BN's products are widely used and a recommended product among COVID-19 patients in the U.S. and will reduce the rate of hospitalization in COVID-19 patients.

209.    Bryan's, NOI's, PNO's and BN's false and misleading statements have deceived or have the capacity to deceive a substantial segment of potential consumers.

210.    Bryan's, NOI's, PNO's and BN's false and misleading statements are likely to influence the purchasing decision of the consuming public and are thus material.

211. Bryan's, NOI's, PNO's and BN's false and misleading statements have an effect on interstate commerce, as their commercial speech, including NOI's press release, statements made during BN's press conference, Bryan's Instagram post, Bryan's social media interviews and the statements made on BN's website, were distributed and consumed nationwide; moreover, HumanN's, PNO's and BN's products are sold and shipped to customers nationwide.

212. Bryan's, NOI's, PNO's and BN's unlawful actions reflect adversely on HumanN because HumanN has no ability to control the quality of NOI's, PNO's, and/or BN's products, and as the believed source of origin, HumanN's efforts to continue to protect its reputation for high quality products will be hampered, resulting in irreparable harm to HumanN.

213. As a direct and proximate result of PNO's, NOI's and BN's false and misleading statements, HumanN has suffered, and will continue to suffer, damage to its business, reputation and goodwill.

214. Pursuant to 15 U.S.C. § 1117, HumanN is entitled to damages for Bryan's, PNO's, NOI's and BN's Lanham Act violations, in an amount to be determined at trial, and recovery of HumanN's costs and reasonable attorneys' fees incurred in this action.

215. Bryan's, PNO's, NOI's and BN's acts are willful, wanton, and calculated to deceive, and are undertaken in bad faith, making this an exceptional case under 15 U.S.C. § 1117, entitling HumanN to recover additional damages and reasonable attorneys' fees.

216. Unless enjoined by this Court, Bryan's, PNO's, NOI's and BN's acts will irreparably injure HumanN's goodwill and damage its ability to compete in the N-O products industry. Pursuant to 15 U.S.C. § 1116, HumanN is entitled to permanent injunctive relief to prevent Bryan, PNO, NOI's and BN's continuing acts.

## EIGHTH CAUSE OF ACTION

*Tortious Interference with Contract*
*Against NOI, PNO and BN*

217.    HumanN incorporates the facts and allegations contained in paragraphs 1 through

216 of this Complaint as if fully set forth herein.

218.    HumanN and Bryan were parties to the Amended Agreement.

219.    NOI, PNO and BN had actual knowledge of the existence of the Amended

Agreement and Bryan's obligations thereunder.

220.    NOI, PNO and BN willfully and intentionally and without justification interfered

with and induced the breach of HumanN's contractual relationship with Bryan.

221.    As a direct and proximate result of NOI's, PNO's and BN's actions, HumanN has

been and will continue to be injured, and is entitled to issuance of an injunction to prevent it

from suffering irreparable harm, and to recover compensatory damages and interest in an amount

to be determined at trial.

## NINTH CAUSE OF ACTION

*Unfair Competition*
*Against all Defendants*

222.    HumanN incorporates the facts and allegations contained in paragraphs 1 through

221 of this Complaint as if fully set forth herein.

223.    Bryan's, PNO's, NOI's and BN's conduct as alleged herein constitutes unfair

competition under the common law of the State of Texas.

224.    Bryan, PNO, NOI and BN unlawfully used HumanN's confidential and

proprietary information for their own commercial advantage to launch competing products to

compete unfairly with HumanN.

225.     Bryan, NOI, PNO and BN also purposefully made false and misleading statements while promoting their products, including but not limited to on Bryan's LinkedIn page, the NOI press release referenced above, statements made during BN's press conference, Bryan's Instagram post, in the social media interviews referenced above, and on BN's website as referenced above.

226.     Bryan, PNO, NOI, and BN intentionally used false and misleading statements to compete unfairly with HumanN by unlawfully trading on HumanN's reputation and goodwill for their own commercial advantage and by misleading consumers into believing that BN's products are superior to the products offered by HumanN and that BN's products are widely used and recommended for the treatment of COVID-19 and reduce the rate of hospitalization for COVID-19 patients.

227.     Bryan's, PNO's, NOI's and BN's false and misleading statements have caused and/or are likely to cause confusion, mistake, or deception as to the affiliation, connection or association of PNO, NOI and/or BN with HumanN, as to the origin, sponsorship or approval of PNO's, NOI's or BN's products by HumanN, or as to the nature, characteristics, and qualities of HumanN and its products, causing injury to HumanN's reputation, goodwill and sales.

228.     HumanN is entitled to damages for Bryan's, PNO's, NOI and BN's unfair competition.

229.     As a result of Bryan's, PNO's, NOI's and BN's conduct, HumanN has suffered damages, and unless such acts and practices are enjoined by this Court will continue to suffer damage to its reputation and goodwill for which is it entitled to relief.

## TENTH CAUSE OF ACTION

*Civil Conspiracy*
*Against all Defendants*

230.    HumanN incorporates the facts and allegations contained in paragraphs 1 through 229 of this Complaint as if fully set forth herein.

231.    As described herein, all Defendants were members of a combination of two or more persons.

232.    The object of the combination was to accomplish an unlawful purpose or a lawful purpose by unlawful means.

233.    All Defendants had a meeting of the minds on the object or course of action, including the participation in the conspiracy.

234.    One or more of the members of the conspiracy committed an unlawful, overt act to further the object or course of action of the conspiracy.

235.    As a direct and proximate result of Defendants' wrongful conduct, HumanN has suffered and will continue to suffer incalculable financial loss, loss of goodwill, loss of customers, and loss of the confidentiality of the confidential information and trade secrets and other damages and irreparable harm.

236.    Plaintiff has suffered irreparable harm as a result of Defendants' actions as described herein and Defendants' actions have been done intentionally and with conscious disregard for the law.

237.    Plaintiff is entitled to exemplary damages against Defendants in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Human Power of N Company respectfully prays and requests that the Court enter judgment against Defendants as follows:

1.      Enjoin Bryan, for a period of two years from the date of the award, from directly or indirectly, for himself, or through, on behalf of, or in conjunction with any person or entity, from providing services to any person or entity that develops, manufactures, or sells over-the-counter dietary supplements, functional foods, ingredients or ingestible supplements that utilize nitric oxide formulations in the aforementioned products;

2.      Enjoin Bryan from making any written or verbal statements, or encouraging others to make any such statements, that defame, disparage or criticize the personal or business reputation, practices or conduct of HumanN, its officers, leadership, stockholders, employees, or any of HumanN's products;

3.      Enjoin Defendants, their agents, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with them, from:

   a.      further use or disclosure of HumanN's confidential and proprietary information and trade secrets;

   b.      making, selling, distributing or in any way profiting from any nitric oxide generating supplement that utilizes any HumanN work product, know-how, confidential information and/or trade secret, including but not limited to any HumanN formula, delivery system, and/or technology;

   c.      making, selling, distributing, or in any way profiting from any product derived from HumanN's topical and/or dual chamber pump delivery system without an accounting and payment of royalties due to HumanN.

4.      Enjoin Bryan, NOI, PNO and their agents, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with them, from:

      a.      using in connection with any products or services, any false designations of origin or false or misleading statements, which suggest or imply any relationship with HumanN and/or HumanN's products;

      b.      making false or misleading statements in advertising regarding HumanN, PNO and BN and/or the products offered by each;

      c.      unlawfully trading upon and appropriating the goodwill and business reputation of HumanN and/or HumanN's products;

      d.      engaging in any acts of unfair competition against HumanN and/or HumanN's products;

      e.      conspiring with, aiding, assisting or abetting any other person or entity in engaging in or performing any of the aforesaid acts.

5.      requiring Bryan, NOI, PNO and BN to take corrective action to correct any erroneous impression persons may have derived concerning the affiliation, connection, or association of Bryan, NOI, PNO and/or BN with HumanN or origination from, and/or sponsorship or approval of HumanN of NOI, PNO or BN's products as a result of Bryan's, NOI's, PNO's and BN's false designation of origin, including without limitation the placement of corrective advertising; and to prevent Bryan, NOI. PNO and BN from engaging in future tortious conduct against HumanN;

6.      Granting HumanN such other relief as the Court may deem appropriate to prevent the public from deriving any erroneous impression persons may have derived concerning the affiliation, connection, or association of Bryan, NOI, PNO and/or BN with HumanN or

origination from, and/or sponsorship or approval of HumanN of NOI's, PNO's, and/or BN's products, as a result of Bryan's, NOI's, PNO's and BN's false advertising and false designation of origin.

7.     Awarding HumanN damages incurred as a result of Bryan's breach of contract, including but not limited to liquidated damages of no less than $25,000 per disparaging statement made by Bryan, reasonable attorneys' fees, costs and expenses and any other applicable relief;

8.     Awarding HumanN damages for Defendants' violations of TUTSA and the DTSA, including exemplary damages and reasonable attorneys' fees;

9.     Awarding HumanN damages and costs sustained as a result of Bryan's, NOI's, PNO's and BN's false advertising and false designation of origin;

10.     Awarding HumanN treble damages pursuant to 15 U.S.C. § 1117(a);

11.     Requiring an accounting to determine Bryan's, NOI's, PNO's and BN's profits resulting from their false advertising and false designation of origin and ordering that the profits by paid over to HumanN;

12.     Declaring this an exceptional case pursuant to 15 U.S.C. § 1117(a) and awarding HumanN its reasonable attorneys' fees;

13.     Requiring Defendants to pay HumanN damages in an amount sufficient to compensate HumanN for injury it has sustained as a consequence of Defendants' unlawful acts in violation of Texas law, including exemplary damages where provided by tort or statutory law;

14.     Awarding HumanN prejudgment and post-judgment interest, costs and fees;

15.     Entering an order awarding HumanN such other and further relief as the Court deems just and proper.

Dated: September 14, 2021                    Respectfully submitted,


                                             By: /s/ *Martin J. Murray*

                                             Martin J. Murray
                                             Texas Bar No. 24079951

                                             MURRAY & DI BELLA, LLP
                                             2 Grand Central Tower, 41st Fl.
                                             140 East 45th St.
                                             New York, New York  10017

                                             Tel: 212-725-2044
                                             Fax: 631-367-1037
                                             Email: mjm@murraydibella.com

                                             *Attorneys for Plaintiff Human Power of N Company*

DocuSign Envelope ID: BB14972B-7AA7-4B80-BC7C-2F7DAF8B14A5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|  |  |
|---|---|
| HUMAN POWER OF N COMPANY,<br><br>                   Plaintiff,<br><br>  v.<br><br>NATHAN BRYAN, PNEUMA NITRIC<br>OXIDE, LLC, NITRIC OXIDE<br>INNOVATIONS, LLC and BRYAN<br>NITRICEUTICALS, LLC,<br><br>              Defendants. | Civ. A. No.: 1:21-cv-00811 |

<u>VERIFICATION  OF JOEL KOCHER</u>

I, Joel Kocher, do hereby verify that:

1.      I am above the age of 21 and competent to make this verification.

2.      I am the Founder of plaintiff Human Power of N Company ("HumanN").

3.      I have read HumanN's Original Verified Complaint in this action and pursuant to 28 U.S.C. §1746, I verify under penalty of perjury that the allegations contained therein are true and correct to the best of my knowledge.

Executed on September 14, 2021


Joel Kocher